Filed 3/3/21  In re R.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.M., Defendant and Appellant. | E075297 (Super.Ct.No. J282902) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

R.M. (Father) and E.N. (Mother; collectively, Parents) are the parents of R.M. (a boy born October 2019; Minor). When Minor was three weeks old, he was removed from Parents' care. The juvenile court denied Father reunification services under Welfare and Institutions Code[1] section 361.5, subdivision (b)(12). Father's sole issue on appeal is that the juvenile court abused its discretion in denying him reunification services.

## FACTUAL AND PROCEDURAL HISTORY

In July 2019, San Bernardino County Children and Family Services (CPS) received a referral that Mother was abusing methamphetamines and Parents were involved in a physically abusive relationship. The referral also alleged that Mother was pregnant with Minor, and Parents were homeless. Mother's two eldest daughters were living with Mother's brother (Uncle) and his wife (Aunt) under permanent guardianship orders. Mother's other three children (the Siblings) were living with Uncle and Aunt temporarily; he "did not intend to take the children from her, but only want[ed] her to get help."[2]

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Neither Mother nor Siblings are parties to this appeal.

On July 22, 2019, a social worker met with Uncle and Aunt at their home.[3] The Siblings were found to be safe. Uncle and Aunt told the social worker that Mother had been seen numerous times with bruises during her pregnancy. When they attempted to get help for Mother, she continued her relationship with Father.

On October 11, 2019, CFS received another referral alleging that Mother did not have custody of her other children when she gave birth to Minor. "The referral stated the mother had a bruise on the outer corner of her right eye while in the hospital." Mother denied any domestic violence.

On October 17, 2019, a social worker made an unannounced visit to the residence where Parents were living, which belonged to Father's uncle. Parents and Minor were home. At the time of the visit, Minor was one week old and appeared to be clean, healthy, and within the normal weight. The social worker met with Parents together. Both of them denied that Mother had a bruise on her eye when she gave birth. Mother stated she had a bad reaction to some medication; she scratched her eye because it was itchy. When the social worker explained that the bruise was reported to be a "purplish" in color, Parents "denied this was true and insisted it was a scratch inflicted by mother due to her reaction to the medication." Parents also denied any current domestic violence. However, they reported that there had been physical domestic violence that included pushing and slapping in the past, but that these acts never occurred in front of

_____

[3] In the detention report, the social worker wrote that the children were doing well at the paternal aunt and uncle's house. This appears to be an error because the referenced aunt and uncle have the same last name as mother.

the children. Parents denied that they punched, kicked, choked or resorted to other physical violence. Parents told the social worker that Mother was arrested in January 2019 for domestic violence; she was drunk and slapped Father. Parents also reported an argument in March 2019 where Father pushed Mother.

Mother told the social worker that the Siblings were with Uncle; he refused to return the Siblings to Mother unless Mother went into drug treatment. Uncle believed Mother was "strung out on drugs." Uncle took Mother to a drug treatment program. Mother left because the rules were too strict, and she believed that the services were not necessary. Mother said that she was trying to get settled before getting the Siblings back. She, however, learned that Uncle applied for temporary guardianship of the Siblings.

Parents denied using drugs or consuming alcohol currently. Mother stated that she smoked marijuana occasionally during her pregnancy because she had extreme nausea and nothing else helped. She also stated she used methamphetamine in the past. She last used in October 2018. Parents denied drug use in front of the children.

After meeting with Parents, the social worker went to Uncle and Aunt's home.[4] They told the social worker that they had the Siblings since May 2019. They stated that Mother has had ongoing drug problems for most of her life and that was why they were caring for the Siblings. Aunt reported that Mother has had a history of domestic violence with the father of the Siblings as well. They also heard from mutual friends that Parents engaged in domestic violence. Although Uncle and Aunt convinced Mother to go to a

_____

[4] Although the social worker refers to the Aunt as the paternal aunt in her report, she has the same last name as Uncle.

4

shelter, she left after only a few days. They also found a letter written by Mother, which detailed the domestic violence. Mother stated that she was fearful she will " 'die by [Father's] hands.' " Uncle and Aunt have not heard from Mother since taking her to the shelter but have received telephone calls from Father wherein he threatened to harm them physically.

When the social worker interviewed the Siblings, they denied seeing any domestic violence between Parents. They, however, saw Mother crying, sad, and with bruises. Moreover, they knew that Father had hit Mother because she had a black eye. They told the social worker that they were scared of Father because he was always fighting and yelling at Mother, and Mother was often crying and had bruises.

On October 21, 2019, the social worker reviewed calls from service logs to Parents' homes, and their criminal records. In January 2019, Mother went to Father's home. She was intoxicated and threw a brick at Father's car and struck him. In April, Father refused to let Mother leave his residence; he struck her four times in the face.

The social worker reported that Father's criminal history included multiple DUI arrests between 1999 and 2006; an arrest for murder in 2009 in which he pled guilty to involuntary manslaughter in 2010; and an arrest for kidnapping in April 2019. Mother had arrests between 2006 and 2013 for breaking and entering, maintaining a drug house, possession of methamphetamine, and being under the influence. Neither parent was cooperative in meeting with the social worker and did not drug test as requested. The social worker also discovered that in March 2019, Mother had applied for a restraining order against Father, which was denied.

On October 23, 2019, the social worker obtained a detention warrant for the children "in order to remove the minors from their respective parents and the legal guardians." Parents brought Minor to the CFS office once they were informed about the warrant.

On October 24, 2019, CFS filed a section 300 petition under subdivision (b), based on Parents' history of domestic violence, Mother's substance abuse problem, and Father's history indicative of substance abuse and violent behavior.

At the detention hearing on October 25, 2019, the juvenile court found a prima facie case for detaining Minor. County counsel requested that Parents' visits be separate due to the significant domestic violence between them. The court noted that Mother had an obvious black eye the day of the hearing. The court stated: "She does have a black eye on her right eye, and it seems like it's going away, but it's there."

In the jurisdictional/dispositional report filed on November 12, 2019, the social worker recommended that reunification services be provided to Mother but not to Father pursuant to section 361.5, subdivision (b)(12).

In the report, the social worker noted that Father denied the substance abuse allegations or that he was arrested for drugs. "Father reported having a medical marijuana card and stated that he last used marijuana a year prior." The social worker, however, reported that a search of the California Department of Justice revealed that Father had multiple arrests for DUI, spousal and corporal injury on a spouse/cohabitant, sex with a minor, and involuntary manslaughter.

Father told the social worker that he and Mother argued frequently because she allowed the Siblings' father to stay at her house. In April 2019, Mother attempted to jump out of their car while Father was taking Mother to the maternal grandfather's house. As Mother was attempting to jump, Father grabbed Mother by the hair and pulled her back into the car. Father stated that " 'the kids were never there when we got into it.' " Father reported that he and Mother were in couple's counseling and he was in individual counseling for his diagnosis of bipolar and schizophrenia. "Father reported being prescribed and taking Depakote seven hundred and fifty (750) mg at night, and Risperdol two (2) mg in the morning and night."

Father's child welfare history included, but was not limited to: (1) On January 8, 2003, there was a sexual abuse referral against Father alleging that Father (31 years old) impregnated a 15-year-old child. The referral was found to be inconclusive; and (2) In April 2006, "it was reported that [Father] hit his prior born child resulting in a bruise to the bridge of her nose. Child denied the allegations. Allegations unfounded."

The social worker reported that CFS "is very concerned about the history of [Father's] conduct to include but not limited to, domestic violence, violent crimes which include kidnapping and taking another's life, and sexual abuse to a minor." The social worker also noted that Father was not forthcoming about his substance abuse, child welfare history, or his history of domestic violence. He denied and minimized the seriousness of his behaviors. Moreover, the Siblings described Father as mean and that they did not feel safe with him in the home. "In addition, although the sexual abuse perpetrated by [Father] was not to a sibling or half-sibling, the children remain at

7

substantial risk of sexual abuse regardless. Due to the nature of [Father's] crimes, it is the recommendation of the department to not offer [Father] reunification services in the best interest of the child pursuant to section 361.5(b)(12)."

Furthermore, according to the social worker, Father "asserted that he did not need services in that he had already complete[d] classes of parenting and anger management while incarcerated, and boasted that he was told by a counselor that he could lead the classes due to his extensive knowledge of the topics. Father stated that he completed these programs voluntarily while in prison for five years for the taking of another's life. Father stated that he took the classes 'to kill time' while incarcerated. Father recalled being incarcerated for involuntary manslaughter use of firearm in 2009."

The social worker stated, "The department is concerned about the mother's ability to protect her children from the conduct of [Father] to include sexual abuse, especially when the mother is under the influence of methamphetamine. In addition, despite the violent acts [Father] imposes on the mother, the mother continues the relationship with him and denies or minimizes [Father's] behaviors."

On November 25, 2019, CFS filed an amended petition, which added allegations under subdivision (b), that Parents engaged in criminal activity that negatively impaired their ability to be present for Minor, and exposed him to unsafe situations; and that Father had untreated mental health diagnoses of bipolar and schizophrenia, which placed Minor at risk. The petition also added an allegation under subdivision (d), that Father sexually abused a minor and impregnated her and had not been treated for those issues, which placed Minor at risk of sexual abuse.

8

On February 19, 2020, CFS filed an additional information to the court. Mother arrived at a visit on December 11, 2019, with a black and swelling eye. She stated that Father hit her in the eye. Father had drug tested with negative results except with one positive test for marijuana on December 17, 2019, and a no-show on January 29, 2020. On January 25, 2020, Minor was removed from Uncle and Aunt because they allowed Mother to watch Minor when they went out.

At the jurisdictional/dispositional hearing on February 27, 2020, the juvenile court sustained the section 300 amended petition allegations under subdivision (b), against Father. The court noted that it understood it could *only* consider convictions, and not arrests. Father, however, was convicted of involuntary manslaughter involving a firearm and there was evidence of domestic violence, which supported the violent criminal history allegation. As to Father's history of mental health, the juvenile court noted that Father's diagnoses did not appear to be sufficiently treated as there was "explosiveness he displays." The court, however, did not sustain the allegation under subdivision (d), because even if the sexual abuse allegations were true, "as disgusting as it is that he was 30-something and having sex with a 15 or 16-year-old, I don't see evidence that makes him necessarily a pedophile, if you will, or a proclivity to molest his own children."

At the further disposition hearing on June 24, 2020, Father's counsel argued that although Father's conviction for involuntary manslaughter qualified as a violent crime, it was a long time ago. Father "has been out since 2014 with no new allegations and no new convictions, so it looks like he has gone 6 years with no issues." Counsel also stated that Father had "completed his anger management and completed and got a certificate on

9

domestic violence and the parenting class. The only drug he ever had any problem with was marijuana, and he has been testing for over a year on that, and he has been clean on marijuana ever since." County counsel noted that the criminal court found an enhancement to the involuntary manslaughter crime because of the violent nature and use of a firearm. Moreover, Father's violent behavior continued with Mother. And even if the court did not sustain the subdivision (d), allegation, the court could consider Father's conduct and sexual involvement with a minor. Furthermore, there was no evidence that Father acknowledged his abusive behavior, benefitted from counseling, or had changed despite participating in services.

At the conclusion of the hearing, the juvenile court noted that it did not have "enough information to show the benefit that [Father] may have received during counseling." The court also referred to the ongoing domestic violence between Parents, as well as the Siblings's statements that they feared him. The court then stated that Father "has failed to meet his burden of proof under clear and convincing evidence, so I'm not clearly convinced that it is in [Minor]'s best interest to offer services." The court went on to state, "However, I'm telling you that if you can provide this Court with some proof that he has benefitted, and it is in the best interest of the children that is more articulate than the information I have today, I'm absolutely willing to consider that. But today, I don't have enough for him to have overcome that burden." The court informed Father that he could file a section 388 petition or an appeal.

On June 26, 2020, Father filed a timely notice of appeal.

10

**DISCUSSION**

A.     THE JUVENILE COURT PROPERLY DENIED REUNIFICATION

SERVICES TO FATHER

On appeal, Father does not challenge the jurisdictional finding of the court, including the section 300, subdivision (b), allegations.  Father challenges only the juvenile court's order denying him reunification services under section 361.5.  For the reasons set forth *post*, we affirm the juvenile court's order.

1.     *STANDARD OF REVIEW*

"We affirm an order denying reunification services if the order is supported by substantial evidence." (*In re Harmony B.*  (2005) 125 Cal.App.4th 831, 839.)  " 'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.  All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' " (*Francisco G.  v. Superior Court* (2001) 91 Cal.App.4th 586, 600 (*Francisco G.*).)

2.     *SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S DENIAL*

*OF REUNIFICATION SERVICES TO FATHER*

Section 361.5, subdivision (b), "sets forth a number of circumstances in which reunification services may be bypassed altogether.  These bypass provisions represent the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances." (*Francisco G.*, *supra*, 91 Cal.App.4th at p. 597.)  "Section 361.5,

11

subdivision (b) symbolizes the Legislature's recognition of the fact that it may be fruitless to provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750.)

"Family reunification services play a critical role in dependency proceedings." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845.) Even when jurisdiction is amply justified, as it is here, at the early stages of dependency, family reunification is the desired goal. Toward that end, parents are offered reunification services. "As a general rule, reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478; see § 361.5, subd. (a); *In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) However, when it is shown "by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.) Section 361.5, subdivision (b), "sets forth a number of circumstances in which reunification services may be bypassed altogether." (*Francisco G.*, *supra*, 91 Cal.App.4th at p. 597.)

A juvenile court may deny reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(12), which provides that services can be denied when the parent or guardian of a child has been convicted of a violent felony, as defined in subdivision (c), of Penal Code section 667.5.[5]  Once the court finds that Welfare and Institutions Code section 361.5, subdivision (b)(12), applies, the court is barred from ordering reunification "unless the court finds, by clear and convincing evidence, the reunification is in the best interest of the child."  (Welf. & Inst. Code, § 361.5, subd. (c)(2).)

In this case, Father initially challenges "whether the evidence is even sufficient to prove the predicate conviction [of involuntary manslaughter], by clear and convincing evidence based upon a computer printout, where no certificate of conviction was provided."  Father, however, fails to cite to any statute or legal authority to address what evidence would be deemed necessary or sufficient to prove he was convicted of involuntary manslaughter.  Moreover, Father failed to raise this issue below, thereby waiving this argument.  If an issue requires a finding of fact, a parent is precluded from raising the issue on appeal when the parent has failed to raise an issue in juvenile court. (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 197.)  Furthermore, not only did Father waive this issue, he acknowledges that "his counsel conceded the involuntary manslaughter conviction and that there was a shooting."  Here, in addition to Father's

_____

        [5]  Penal Code section 667.5, subdivision (c), provides in part that a "violent felony" is defined as "any felony in which the defendant uses a firearm which use has been charged and proved as provided in subdivision (a) of Section 12022.5 or 12022.55." (Pen. Code, § 667.5, subd. (c)(8).)

13

counsel conceding that Father was found guilty of involuntary manslaughter, a violent felony, there is ample evidence in the record that supports Father's conviction. Therefore, the trial court's denial of reunification services to Father under section 361.5, subdivision (b)(12), is supported by substantial evidence.

In addition to raising an issue with the sufficiency of the evidence regarding his conviction, Father attempts to argue the circumstances of the incident that resulted in his conviction should lessen the degree of his criminal activities because "the circumstances of the incident in question resulted from a home invasion at [Father's] home." Father also raises the fact that the conviction was remote in time. Notwithstanding Father's contentions, the plain language of section 361.5, subdivision (b), does *not* provide any exceptions to parents convicted of a violent felony. Therefore, Father's arguments fail.

Moreover, Father argues that the court should have offered him reunification services because it is in the best interest of the child under section 361.5, subdivision (c): " ' Section 361.5, subdivision (c) enables a parent to obtain reunification services notwithstanding section 361.5(b)(12) where the parent demonstrates reunification is in the child's best interest by offering evidence of, among other things, his or her current ability to parent.' (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.)" Specifically, Father "contends that the remoteness of the involuntary manslaughter conviction, his compliance and accessing services, plus the fact that he and Mother are together as a couple and intend to raise their child together meet the standard that a grant of reunification services is in the child's best interest." We disagree.

"[A] court in exercising its discretion on the issue of best interests of the child has the 'ability to evaluate whether the parent will utilize . . . services and whether those services would ultimately inure to the benefit of the minor.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1166, relying on *In re Jesse W.* (2007) 157 Cal.App.4th 49, 66.) We " 'will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination,' and noting that '[w]hen two or more inferences reasonably can be deduced from the facts, [a reviewing court has] no authority to reweigh the evidence or substitute [its] judgment for that of the juvenile court']." (*In re G.L.*, at p. 1166, relying on *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.)

Here, Father stated that he did not need services because he had already completed parenting and anger management classes while he was in prison. He boasted that his counselor told Father that he could lead the classes because of Father's extensive knowledge. However, after his release Father failed to demonstrate what he had learned from the services he received. He continued to have anger management issues and continuously engaged in domestic violence with Mother. As noted in detail *ante*, a couple of the domestic violence incidents required law enforcement involvement. Moreover, Mother had a black eye in the hospital when she gave birth to Minor and the court even noted that Mother had a black eye at a hearing in October 2019. Although Father said he and Mother were in couple's counseling in November 2019, Mother attended a visit with the children in December 2019 with a black and swelling eye; she said Father hit her in the eye. Mother had written a letter detailing the domestic violence

15

with Father and stated that she was fearful she would die by Father's hands. Furthermore, the Siblings told the social worker they feared Father and they did not feel safe with Father.

Therefore, even though defendant suggests that he and Mother can offer Minor stability, their volatile and physically abusive relationship demonstrates otherwise. In fact, when making its determination, the juvenile court noted that the domestic violence, which impacts the children's safety, "is really the biggest factor for the Court in considering whether or not there is clear and convincing evidence there's best interest to this child. . . . I don't have enough information to show the benefit that he may have received during counseling . . . but right now, my ruling is that he has failed to meet his burden of proof under clear and convincing evidence, so I'm not clearly convinced that it is in [Minor]'s best interest to offer services." The court did go on to state, "However, I'm telling you that if you can provide this Court with some proof that he has benefitted, and it is in the best interest of [Minor] that is more articulate than the information I have today, I'm absolutely willing to consider that. But today, I don't have enough for him to have overcome that burden."

Based on the evidence provided above, we cannot find that the juvenile court's decision was arbitrary, capricious or patently absurd. Hence, the court did not abuse its discretion in finding that it was not in Minor's best interests to provide Father with reunification services.

## DISPOSITION

The juvenile court's jurisdiction findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

                                        J.

We concur:

McKINSTER _____

         Acting P. J.

FIELDS _____

         J.